1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10

11  JEREMY L. KEATING, et al.,              Case No.:  3:15-cv-00057-L-JMA

12                          Plaintiffs,     **ORDER DENYING**
                                            **PLAINTIFFS'/COUNTER-**
13  v.                                      **DEFENDANTS' MOTION FOR**
                                            **PARTIAL SUMMARY JUDGMENT**
14  JOHN A. JASTREMSKI, et al.,             **[Doc. 42]**

15                          Defendants.

16  THE RETIREMENT GROUP, LLC,

17                          Counterclaimant,

18  v.

19  JEREMY KEATING, et al.,

20

21                          Counter-defendants.

22

23          Pending before the Court is a motion for partial summary judgment filed by

24  Counter-defendants Keating, Gigliotti and Miele ("Advisors") as to Counterclaimant The

25  Retirement Group's ("TRG") first and second causes of action alleging misappropriation

26  of trade secrets and breach of contract.  Counter-defendant Securities America, Inc.

27

28

                                         1

1   ("SAI") filed a notice of joinder in the Advisors' motion.[1]  ("Joinder" [Doc. 46].)  The

2   Court decides the matter on the papers submitted and without oral argument.  *See* Civ. L.

3   R. 7.1(d)(1).  For the reasons stated below, Counter-defendants' motion is denied.

4   **I.   BACKGROUND**

5       TRG is a Registered Investment Advisor ("RIA") registered with the Securities and

6   Exchange Commission that specializes in providing investment advice to a niche market

7   of retirees and soon-to-be retirees.  (Countercl. [Doc. 24] ¶¶ 1 & 14.)  TRG created a

8   customer base through a specific and proprietary method of learning the identity of and

9   soliciting persons who are about to receive retirement plans or lump sum distributions.

10  (*Id.* ¶ 14.)  TRG maintains this confidential client and prospective client information

11  through its online database known as Sales Force[2].  (*Id.* ¶¶ 24 & 47.)

12      To conduct its business, TRG contracted with Independent Advisor

13  Representatives ("IARs").  (Countercl. ¶ 1.)  The Advisors were employed by TRG as

14

15

16

17

_____

18  [1]   SAI joined in the Advisors' motion to the extent they are entitled to summary judgment
    on the claim for misappropriation of trade secrets.  (Joinder at 3.)  While joinders are
19  permitted, separate briefing is not provided for without leave of Court.  See Civ. Loc.
    Rule 7.1.  Nevertheless, SAI filed its own reply brief [Doc. 54], wherein it raises new
20  arguments not presented in the Advisors' briefs.  Aside from failure to secure leave of
    Court for their reply, SAI raised new arguments for the first time in their reply.  The
21  Court declines to consider those arguments at this time, as it would deprive TRG of an
    opportunity to respond.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The
22  district court need not consider arguments raised for the first time in a reply brief.")

23

24  [2] The information in TRG's database includes: customer and prospective customer
    identity and contact information; customer account information and current holdings;
25  customer investment preferences; customer employment status; prospective customer
    employment information; prospective customer retirement account status and probability
26  of retiring; referral information; and interest in taking a "lump sum" offer.  (Countercl. ¶
27  15; Opp'n at 3:2–13.)

28

IARs[3].  (MSJ [Doc. 42] at 3:24–28.)  TRG cannot independently offer its clients securities or insurance products on a commission basis as it is not a broker-dealer registered with the Financial Industry Regulatory Authority ("FINRA").  (*See* Countercl. ¶ 14; MSJ at 4:7–14.)  To provide its clients broker-dealer specific products, TRG used the services of FSC Securities Corporation ("FSC"), a FINRA registered broker-dealer. (Countercl. ¶ 14.)  In addition to their employment as TRG IRAs, the Advisors were FINRA-registered and worked for FSC as Registered Representatives ("RRs").  This allowed them to carry out commission-based securities transactions for TRG clients. (*See id.* ¶ 26.)

As a condition of their employment with TRG, the Advisors executed several documents, including multiple agreements addressing the confidentiality and trade secret nature of TRG client information which limited and prohibiting its disclosure or use. (*See id.* ¶ 18.)  These agreements included a Marketing and License Agreement, Confidentiality Agreement, and Corporate Online Systems User Agreement.  (Countercl. ¶¶ 19–22.)  Further, before an advisor could access TRG's client information in a database, the advisor was confronted with a "splash screen," requiring the advisor to affirm and agree that he or she would keep TRG information confidential.  (*Id.* ¶¶ 24–25.)  Password-protected access to TRG's database and TRG information on any third-party platform, such as the FSC database and databases of affiliated financial services firms, including insurance carriers and money managers, was granted only after advisors had signed these agreements and clicked through the splash screen.  (*Id.* ¶¶ 18, 23, 28; *see also* Decl. of John Jastremski ("JJ Decl.") [Doc. 51-1] ¶ 36.)  The Advisors could not enter into RR agreements with FSC to service TRG clients without the business

---

[3]All Counter-defendants, including the Advisors, are included in TRG's claim for misappropriation of trade secrets, as TRG contends there was a "tacit or express agreement by and between all of the named Counter-defendants and co-conspirators to misappropriate [TRG's] confidential, proprietary and trade secret information." (Countercl. ¶¶ 10 & 39.)

relationships and signed agreements with TRG designed to protect the confidentiality of TRG's client information.  (Countercl. ¶ 26.)

The use of non-public client information, such as the information contained in TRG's database, is subject to several state and federal laws and regulations that protect the confidentiality of client and prospective client information, including Federal Securities Regulation S-P and California Financial Code § 4050, *et seq*.  (Countercl. ¶¶ 17 & 41.)  Unlike TRG, FSC is a signatory of the "Protocol for Broker Recruiting" (the "Broker Protocol"), an agreement among several securities broker-dealers permitting representatives to take certain client information with them when changing firms.  (MSJ at 7:24–8:9; Opp'n at 1:14; Decl. of Jeremy Keating ("Keating Decl.") [Doc. 42-2] Ex. K (Broker Protocol) [Doc. 42–14].)  Under the Broker Protocol, representatives are allowed to transfer: client name, address, phone number, email address, and account title.  (Broker Protocol at 1.)

On January 10, 2015, the Advisors' affiliations with TRG and FSC were terminated.[4]  (Countercl. ¶ 32.)  On January 12, 2015, the Advisors transferred their FINRA licenses to SAI, another FINRA registered broker-dealer and signatory of the Broker Protocol.  (MSJ at 8:12–15.)  Upon departure, the Advisors took TRG client information,[5] which they believed was allowed pursuant to the Broker Protocol.  (*Id*. at 8:17–19.)

On the same day, the Advisors filed this action against TRG seeking a declaration that "(b) [the Advisors] have not misappropriated any protectable TRG trade secret; (c) [the Advisors] have not breached any enforceable provision of the Agreements with TRG

---

[4] It is disputed whether the terminations were voluntarily. (Countercl. ¶ 32; MSJ at 8:11–12.)

[5] The parties dispute whether the Advisors obtained the information from TRG or FSC. (Countercl. ¶ 32; MSJ at 8:15–19.)

1  and that any provisions of those agreements TRG may rely upon to try to prevent [the

2  Advisors] from using the information it obtained from FSC, are invalid under California

3  law; (d) TRG has no claim against [the Advisors] arising out of their departure; and (e)

4  TRG is not entitled to a temporary restraining order, a preliminary injunction, or other

5  relief arising out of [the Advisors'] departure."  (Compl. ¶ 32.)

6  TRG filed a Counterclaim alleging eight causes of action including

7  misappropriation of trade secrets and breach of contract.[6]  The Advisors move for partial

8  summary judgment as to the first and second causes of action alleging (1)

9  misappropriation of trade secrets and (2) breach of contract (against the Advisors).  SAI

10  joined in the Advisors' motion to the extent they seek summary adjudication of

11  misappropriation of trade secrets.  TRG opposes.  For the reasons stated below, the

12  motion is denied.

13  **II.   LEGAL STANDARD**

14  Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where

15  the moving party demonstrates the absence of a genuine issue of material fact and

16  entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

17  *Catrett,* 477 U.S. 317, 322 (1986).  A fact is material when, under the governing

18  substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*,

19  477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is

20  such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

21

22

23

---

24  [6] TRG's Counterclaim alleges (1) misappropriation of trade secrets; (2) breach of contract

25  (against the Advisors for misappropriating TRG information and soliciting TRG clients
   and prospective clients.); (3) breach of contract (against Counter-defendants Davenport,

26  Sullivan, and Silvers for soliciting employees away from TRG.); (4) conversion; (5)

27  intentional interference with contract; (6) intentional interference with prospective
   business advantage; (7) negligent interference with prospective business advantage; and

28  (8) unfair trade practices.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elect. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks and citation omitted)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

III.   **DISCUSSION**

The Advisors argue (1) TRG's misappropriation of trade secrets claim must fail because TRG client information disclosed through FSC database, which was accessible to the Advisors, cannot be considered protectable trade secrets of TRG; and (2) TRG's breach of contract claim must fail because the contractual provisions are illegal restraints on trade under California Business and Professions Code § 16600.

Section 16600 provides, "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  "[U]nder section 16600's plan meaning 'an employer cannot by contract restrain a former employee from engaging in his or her profession, trade, or business unless the agreement falls within one of the exceptions' to section 16600."  *The Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1235 (2009) (quoting *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 946 (2008)).

The Advisors maintain that all the agreements they signed with TRG are void as a matter of law as unlawful restrains on the exercise of their profession.  The argument is unavailing, however, because restraints on former employees' use of their employer's trade secrets is one of the exceptions to section 16600.  *Galante*, 176 Cal. App. 4th at 1237 ("former employees may not misappropriate the former employer's trade secrets to unfairly compete with the former employer"); *Golden v. Cal. Emergency Physicians Med. Group*, 782 F.3d 1083, 1091 n.4 (2015) ("the state courts uphold restrictive contracts to protect trade secrets") (applying Cal. law); *see also Edwards*, 44 Cal.4th at 946 n. 4 (noting the "so-called trade secret exception to section 16600").  Accordingly, to decide whether summary judgment is appropriate on the alleged claims of misappropriation of trade secrets or breach of contract, the Court must first determine whether TRG's client information in FSC's database is a trade secret.

In this regard, the Advisors concede that they took information under the Broker Protocol and confine their motion to the argument that the trade secret claim is barred "to the extent it seeks to impose liability for [their] use of FSC's customer information"

under the Broker Protocol.  (MSJ at 16:4 n.5.)  They do not address TRG's claim to the extent it is based on the theory that they misappropriated other sources of allegedly trade secret information or used trade secret information to solicit non-customer prospects. Therefore, the information to be considered for trade secret purposes is limited to client name, address, phone number, email address, and account title.

California's Uniform Trade Secrets Act ("CUTSA") defines "trade secret" as follows:

> "Trade secret" means information, including formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  Numerous courts have concluded customer lists may qualify for trade secret protection under CUTSA.  *See MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993); *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1287–88 (1990); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1521–22 (1997).  Whether information is a trade secret is ordinarily a question of fact.  *Morlife*, 56 Cal. App. 4th at 1521; *San Jose Constr., Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1537 (2007).

It is undisputed that TRG meets the first prong of the trade secret definition.  TRG has demonstrated its client lists were the product of substantial time, expense, and effort. (*See* JJ Decl. ¶¶ 3–4, 6–7, 10–13.)  TRG's client list compilations were the result of efforts including: research, cold calls, personalized phone calls, targeted email, mail marketing, seminars, personal meetings, and referrals.  (*Id.* ¶¶ 10–13.)  TRG spends over two million dollars per year on its marketing and client service efforts.  (*See id.* ¶ 6.) TRG's client information has potential economic value because a competitor could use it

to direct sales efforts to the "niche" market of clients who will retire soon, are likely to use the services of a financial advisor, and represent the top 1-5% of employees at an employer.  (*Id.* ¶¶ 4, 15–18.)  The TRG's client information was not accessible to the public or generally known to others in the industry and there is no public directory or readily available list containing the database contents.  (*Id.* ¶ 4.)

As to the second prong, the Advisors heavily rely on *The Retirement Group, Inc. v. Galante*, 176 Cal. App. 4th 1226 (2009), to argue that the Broker Protocol information in FSC's database cannot be a TRG trade secret as a matter of law.  They interpret *Galante* to hold that TRG's client information held by FSC, a third party broker-dealer, was not a trade secret because it was available to the departing TRG representatives from FSC. They contend that the information they took, which they had used to service TRG clients as RRs of FSC, was "separate from TRG, and [they] took that information only from [FSC's] records that were separate, distinct, and independent of, and not controlled or maintained by, TRG," and thus, cannot be a protectable TRG trade secret.  (MSJ at 3:1– 3.)  However, *Galante* did not decide this issue, as it was conceded.  *See Galante*, 176 Cal. App. 4th at 1240 ("*TRG did not dispute* that the [client information was] readily available to Advisors from independent third party sources such as [their employer as well as other sources].") (emphasis added).

In the present case, TRG has shown it had created a different business structure as well as substantially different contracts, splash screens, privacy policies, systems, and protections, in response to the *Galante* decision.  (JJ Decl. ¶¶ 34–35.)  The MLA agreements at issue in *Galante* were changed substantially, and the Corporate Online User Agreement, splash screen, and TRG Privacy Policy are all new.  (*Id.* ¶ 35.)  Finally, here, unlike in *Galante*, TRG disputes that the client information was readily available to the Advisors in FSC's database, and disputes the nature of FSC's "independent" relationships with the Advisors and TRG clients.  TRG's evidence shows that all client information provided to FSC was created directly by the efforts of TRG, shared and maintained under strict TRG control, and shared for the sole purpose of advancing TRG's

business.  (JJ Decl. ¶¶ 21–22, 39; Decl. of Mary Simonson ("Simonson Decl.") [Doc. 51–3] ¶¶ 7–8.)

The Advisors contend that TRG failed to maintain the secrecy of the client information because FSC had separate relationships with both its clients and the Advisors, evidenced by separate client account procedures, employment agreements, and commissions.  (Keating Decl. ¶¶ 10, 12, 15–16.)   As legally required, FSC maintained its own records of client information which the Advisors claim FSC controlled exclusively. (*Id.* ¶ 15.)  Further, FSC's privacy policy placed clients, advisors, and TRG on notice that advisors could take information upon departure and FSC allowed Advisors to do so under the Broker Protocol.  (*Id.* ¶¶ 17–18.)

TRG counters that, to maintain the secrecy of its information, it had several agreements in place with all its advisors and FSC.[7]  (JJ Decl. ¶ 36.)   FSC agreed to keep TRG's client information resident on FSC's databases as confidential to TRG.  (*Id.*) TRG maintained complete control over all TRG customer accounts at FSC.  (*Id.*)  The only individuals with access to TRG trade secrets on FSC's databases were TRG advisors with clearance to access the same information through TRG's own database.  (*Id.*)

No TRG advisor in the capacity as an FSC RR was able to gain access to any of TRG's data on FSC's databases until he or she had entered into several agreements with TRG, including the Corporate Online System User Agreement which requires advisors to maintain the confidentiality of TRG's trade secrets on FSC's databases.  (*Id.*)  In addition, each time an advisor accesses TRG client information on an FSC database, the advisor is confronted with a "splash screen," stating, among other things, that access is being granted only by the pre-authorization of TRG and that accessing the information through a third party database "does not invalidate the trade secret nature of the

_____

[7]   The same protections were in place to the extent TRG maintained any client information in databases of any other affiliated third-party financial services firms, such as databases of insurance carriers and money managers.  (*See* JJ Decl. ¶ 36.)

database." (*Id.*)  TRG further controlled access to its information on FSC databases by requiring that usernames and passwords be pre-approved by TRG.  (*Id.*)  The usernames and passwords could be terminated by TRG at any time.  (*Id.*)  Advisors could not perform services for non-TRG clients at FSC or access any client information other than for the clients assigned to them by TRG.  (*Id.*)  Furthermore, advisors' RR relationships with FSC were conditional upon a concurrent contractual relationship with TRG.  (*Id.*)  Thus when an advisor's TRG relationship is terminated, the RR status with FSC and access to TRG information on FSC's databases were likewise terminated.  (*Id.*)

TRG presented sufficient evidence to show that it took steps to maintain the secrecy of its client information in FSC's database by restricting access, entering into extensive agreements, and utilizing passwords and warnings.  TRG required the Advisors to go through training and sign agreements informing them of the confidential and trade secret nature of TRG's client information both in its own database and FSC's.  The Marketing and License Agreement, Confidentiality Agreement, Corporate Online Systems User Agreement, Privacy Policy and use of "splash screens" are all supportive of TRG's efforts to maintain the secrecy of its client information.  (*See* TRG's Notice of Lodgment of Exhibits [Doc. 51-7 & 51-8] Exs. A–J.)

## IV.  CONCLUSION

Drawing all inferences in favor of TRG, as the Court must on summary judgment, *see Matsushita*, 475 U.S. at 587, TRG has raised triable issues of material fact as to whether its client information in FSC's database was a protectable trade secret.  Because this issue underlies both claims attacked by the Advisors' summary adjudication motion, the motion is denied.

**IT IS SO ORDERED.**

Dated:  September 22, 2016

_____
Hon. M. James Lorenz
United States District Judge

3:15-cv-00057-L-JMA