1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                        SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| JEREMY L. KEATING *ET AL.*, | CASE NO. 3:15-cv-00057-L-AGS |
| Plaintiffs, | **ORDER (1) ADOPTING SPECIAL MASTER'S REPORT AND RECOMMENDATION, (2) GRANTING MOTION FOR TERMINATING SANCTIONS, AND (3) ENTERING DEFAULT** (Docs no. 157, 442) |
| v. | |
| JOHN A. JASTREMSKI *ET AL.*, | |
| Defendants. | |
| AND RELATED CROSS-ACTIONS. | |

        In this action alleging misappropriation of trade secrets, pending before the

Court is a motion for terminating sanctions for spoliation of evidence filed by

Defendant John A. Jastremski and Defendant/Counterclaimant The Retirement Group,

LLC ("TRG") against Plaintiffs/Counter-Defendants Jeremy Keating, Richard P.

Gigliotti and Alexander J. Mele (collectively, "the Keating Group"), as well as

Counter-Defendants Securities America, Inc. ("SAI"), Lloyd J. Silvers, Steven Dalton

and Ardent Retirement Planning, LLC ("Ardent;" Silvers, Dalton and Ardent are

referred to collectively as "the Ardent Group").[1]  (Doc. no. 157).  The Court appointed

_____

[1]     A settlement reached in April 2019 disposed of all claims between the Keating
Group, SAI and Jastremski.  (*See* doc. no. 436 (Klein Decl.) at 2; *see also* docs. no.

Hon. Ronald S. Prager (Ret.) as the Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure to prepare a report and recommendation. (Docs. no. 316, 323.) Pending before the Court is TRG's motion to adopt the Special Master's report and recommendation (docs. no. 428, 440 (redacted), "Recommendation") pursuant to Rule 53(f). (Doc. no. 442.) The Ardent Group filed an opposition, and TRG replied. For the reasons that follow, the motion is granted, the Recommendation is adopted, and TRG's underlying motion for terminating sanctions is granted.

## I.  BACKGROUND

TRG is a registered investment advisor with the Securities and Exchange Commission ("SEC"). Ardent is TRG's competitor. Through its affiliated investment advisors, TRG provides asset management services to wealthy retirees who receive large lump-sum employer distributions upon retirement. To trade securities on behalf of clients, investment advisors use the services of registered broker dealers. TRG's broker dealer is First Securities Corporation ("FSC"). Ardent's broker dealer is SAI. Jastremski owns TRG, while Dalton is the head of Ardent and principal of SAI. Members of the Keating Group and Silvers were TRG's investment advisors before they transferred to Ardent and SAI.

TRG compiles a proprietary data base of prospects and reaches out to them through advertising and seminars. Fewer than five percent (5%) of prospects become TRG's clients. TRG's client data base includes extensive personal information to effectively serve the clients' needs ("Salesforce database"). This information enables TRG's investment advisors to build client relationships and retain clients. TRG took extensive security measures to keep the Salesforce database confidential. TRG's employees, including the Keating Group and Silvers, signed agreements with TRG, prohibiting them from using or disclosing confidential information. Furthermore,

/ / /

_____

402, 403, 407, 408.) Accordingly, TRG remains as the moving party and the Ardent Group members remain as the opposing parties.

TRG's privacy policy precluded its employees from taking certain proprietary information when they terminated their employment with TRG.

According to TRG, Dalton organized a conspiracy to steal TRG's proprietary prospect and client information by soliciting Silvers and the members of the Keating Group to transfer to Ardent and SAI and bring this information with them. In 2013, Silvers left TRG to join Dalton and a group of investment advisors who eventually formed Ardent. In October or November 2014, the Keating Group members struck a deal with Ardent's broker dealer SAI. Although the members of the Keating Group were preparing to leave TRG in the spring of 2015, they were terminated on January 10, 2015, when TRG discovered they were connected to suspicious downloads of TRG data. Accordingly, the Keating Group transferred to Ardent and SAI in January 2015. TRG contends that Silvers and the Keating Group surreptitiously downloaded TRG's proprietary information before their departure and transferred it to Ardent.

On January 12, 2015, members of the Keating Group filed this action against Jastremski and TRG. (Doc. no. 1 ("Complaint").) They sought a declaratory judgment because they feared TRG would sue them for misappropriation of trade secrets and obtain a preliminary injunction against them arising from their departure.[2] (*Id.* at 2, 5, 8.) TRG and Jastremski filed a counterclaim against the Keating Group, the Ardent Group, SAI and others for misappropriation of trade secrets and other tort and contract claims. (*See* docs. no. 24, 106.)

After more than two years of litigation, including frequent discovery disputes and motions for sanctions, TRG and Jastremski moved for terminating sanctions contending that the Keating Group, SAI, and the Ardent Group engaged in discovery abuses, lying under oath, and destruction of evidence. The Court appointed the Special Master to prepare a report and recommendation. The Special Master held a six-day evidentiary hearing. During the proceedings, the Keating Group and SAI settled and

/ / /

---

[2] The complaint was subsequently amended. (*See* doc. no. 17.)

were dismissed.  (*See* fn. 1 *supra*.)  Accordingly, only sanctions against the Ardent Group remain at issue.

After considering voluminous briefing, evidence, including live testimony, and extensive argument, the Special Master found for TRG.  He concluded that members of the Ardent Group "intentionally and maliciously" destroyed evidence (Recommendation at 11), and recommended granting TRG's motion and striking the Ardent Group's answers.  The Ardent Group objects.  (*See* docs. no. 443, 445, 453.)  In the absence of a stipulation to the contrary, *de novo* standard of review applies to these objections.  Fed. R. Civ. Proc. 53(f).

## II.  DISCUSSION

Federal courts have inherent authority to sanction a party who engaged in spoliation of evidence.  *Leon v. IDX Sys. Corp.,* 464 F.3d 951, 958 (9th Cir. 2006). Litigants engage in "spoliation of  documents as a matter of law only if they had some notice that the documents were potentially relevant to the litigation before they were destroyed."  *United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1001 (9th Cir. 2002).[3]  "Moreover, because the relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents."  *Leon*, 464 F.3d at 959 (ellipsis and brackets omitted).

Terminating sanctions are warranted when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings."  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (dismissal); *see also Televideo Sys's, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) (default).  The following factors should be considered before imposing the "harsh sanction" of terminating a party's claims or defenses:

> (1) the public's interest in expeditious resolution of litigation; (2) the
> court's need to manage its dockets; (3) the risk of prejudice to the party

---

[3]     Unless otherwise noted, internal quotation marks, citations, and footnotes are omitted throughout.

seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

While the district court need not make explicit findings regarding each of these factors, a finding of willfulness, fault, or bad faith is required for dismissal to be proper. Additionally, the district court must consider less severe alternatives than outright dismissal.

*Leon*, 464 F.3d at 958; *see also Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1022 (9th Cir. 2002) (applying same factors to sanction of default).

## A. Destruction of Evidence

### 1. The Ardent Group's Plan to Destroy Evidence

The Special Master found that destruction of evidence was part of a deliberate plan in anticipation of litigation. (*See, e.g.,* Recommendation at 10-13.) Upon review of the record, the Court adopts this finding.

In showing that destruction of evidence was a part of the Ardent Group's plan, TRG relies in part on testimony provided by Michael Dalton.[4] He testified that in 2012, Dalton was actively recruiting TRG staff and financial advisors with the intent to also obtain as much of TRG's confidential client database as possible. (M. Dalton Decl. at 1-3, 8.)[5] He retained M. Dalton as an experienced recruiter. (M. Dalton Decl. at 1; Dalton at 1165, 1240-43, 1246-47.[6])

Silvers was a financial advisor at TRG. (Silvers at 1030.) M. Dalton put him in touch with other advisors who wanted to start a new firm, which eventually became Ardent. (Silvers at 1031-32.) The purpose of Ardent was to generate leads (prospects

---

[4]     To distinguish between Dalton (Steven Dalton), who is a party to this case, and Michael Dalton, who is not, the Court refers to Michael Dalton as M. Dalton.

[5]     M. Dalton's declaration is found in doc. no. 456-1 at 550-62. Page references in the text above are to the page numbers in the declaration.

[6]     All citations to witnesses by name only are to their testimony in the Special Master proceedings. Transcripts can be found in docs. no. 404-8 through 404-10 (transcript pages 1-883) and docs. no. 432-1 through 432-3 (transcript pages 884-1642.) Page references are to the page numbers in the transcript.

and clients) for investment advisors at SAI. (Dalton at 1161; *see also* Dalton at 1158, 1164-65, 1171-72.) After Silvers resigned from TRG in May 2013, Dalton encouraged him to recruit other TRG staff and advisors, including the Keating Group. Silvers obliged. (Dalton at 1286-87, 1334-35; *see also* Silvers at 1030, 1032; M. Dalton Decl. at 4; Dalton at 1204.) Already in July 2013, Silvers was communicating with Keating regarding his departure from TRG. (Silvers at 1102-04). Once the Keating Group started working for Ardent and SAI, Dalton was paid a percentage of their income. (Dalton at 1285.) If the Keating Group members brought more TRG prospect and client information to Ardent than they lawfully could, that inured to the Ardent Group's benefit. (Dalton at 1293.)

M. Dalton, who was present at the formation of Ardent "day in, day out" (Dalton at 1240), testified about several conference calls with Silvers, Dalton and their associates. (M. Dalton Decl. at 2, 4; Dalton at 1301 (M. Dalton was on weekly conference calls).) They recognized already in 2013 that their activities may invite a lawsuit from Jastremski and TRG. (M. Dalton Decl. at 2, 4.) They held regular conference calls discussing recruitment, TRG's prospect/client database and related topics. (M. Dalton Decl. at 3, 5, 11, 12; *see also* M. Dalton Dep.[7] at 234, 373 (conference calls).) The decision to communicate via conference calls as opposed to emails was deliberately made to avoid creating documents which could be used against them in future litigation. (M. Dalton Dep. at 372-73; M. Dalton Decl. at 6.)

Once the Keating Group advised Silvers and Dalton in February 2014 of their intent to transfer to Ardent and SAI, they joined in monthly conference calls, which included discussing litigation risk with input from legal counsel. (M. Dalton Decl. at 5-6; M. Dalton Dep. at 168-69; Dalton at 1335-37 (referencing potential litigation in April and June 2014); *see also* Silvers at 1109 (in March 2014, Silvers was arranging for a meeting between Keating and Dalton).) They were certain that TRG and

---

[7] Excerpts from M. Dalton's deposition are found in docs. no 456-1 at 318-362 and 453-2 at 34. Page references in the text above are to the page numbers in the deposition transcript.

Jastremski would file a lawsuit against them. (M. Dalton Dep. at 169.) A pre-emptive lawsuit against TRG upon the Keating Group's departure was a part of the transition plan. (M. Dalton Decl. at 7.)

The conference calls included discussion of taking detailed, not publicly available client and prospect information from TRG as part of the Keating Group's transition. (M. Dalton Decl. at 10, 11; M. Dalton Dep. at 249-50, 266-67, 374.) In early 2015, they also discussed destruction of evidence by referring to destroyed documents as "lost" or "unable to locate," removing links to Ardent's database, and removing or relocating Google Drive data. (M. Dalton Decl. at 12; *see also* M. Dalton Dep. at 270-72.) Among other things, Dalton instructed the Keating Group to wipe data from their phones. (M. Dalton Decl. at 12.) The data he was referring to was the data the Keating Group downloaded from the TRG database. (M. Dalton Decl. at 12.)

Ardent's database was stored on zoho.com ("Zoho database"). (Silvers at 1038.) The Zoho database contained different categories of data, including prospects and clients. (Dalton at 1207-08; *see* Silvers at 1092.) The information surreptitiously downloaded from TRG's database was loaded into cloud storage accounts, initially Dropbox and Google Drive, before it was uploaded into the Zoho database. [8] (M. Dalton Decl. at 8-11; *see also* Silvers at 1128 (admitting that Keating's TRG contract was sent via Dropbox because they didn't want Jastremski to know); *see also* Dalton at 1299-300 (Mele and his assistant, Tina Abernathy,[9] used Google Drive as a cloud drive to transition Mele's book of business from TRG to Ardent).)[10] Data on Google Drive

---

[8]     Other cloud storage service providers mentioned in this Order are OneDrive and box.com. Cloud storage can be accessed either by using software or links on the computer to synchronize the computer with the cloud storage account, or by logging directly into the cloud storage account using a web browser. (Sevel at 345.) In this case, data stored in the cloud could also be accessed on zoho.com. (Silvers at 1038.)

[9]     *See also infra* pp.16, 20.

[10]     Mele's email exchange with Silvers corroborates this. On November 7, 2014, when Mele had already decided to leave TRG, he wrote they were "building a Google Drive to address [transition questions]." (Silvers at 1129-30 (referencing TRG Exh. 256).) "TRG Exh." refers to TRG's exhibits in the Special Master proceeding. They are found in docs. no. 404-1 through 404-6.

was later transferred to OneDrive. (Silvers at 1038.) In their conference calls, Dalton, Silvers, the Keating Group and their associates referenced the use of fictitious email addresses to avoid detection of the surreptitious data transfers from TRG, discussed removal of links to the Zoho and Google Drive accounts, and moving data stored on Google Drive to other cloud storage (M. Dalton Decl. at 11, 12; M. Dalton Dep. at 261-62, 269) to avoid "any footprints in the sand" or "popcorn trail" (M. Dalton Dep. at 270-72).

The Ardent Group argues that M. Dalton, their former co-conspirator, should not be believed because TRG paid him for his testimony. (Doc. no. 453 ("Ardent Opp'n") at 9, 10.)[11] M. Dalton was a recruiter who worked for TRG and Ardent's broker dealer SAI. (M. Dalton Decl. at 1, 12.) TRG caught him soliciting TRG staff and advisors, including those he had previously recruited for TRG and for whom TRG had paid him commissions. (M. Dalton Decl. at 12.) His declaration dated December 22, 2016, as well as discovery of all of his electronic devices, were provided in exchange for a release. His deposition was taken thereafter. (M. Dalton Decl. at 13; M. Dalton Dep.; Silvers at 1134-35.)

M. Dalton was employed by TRG on a contract basis and was paid a commission when someone he recruited joined the firm. (M. Dalton Dep. at 23.) When he settled with TRG in December 2016, TRG offered him a draw he could use on an as-needed basis.[12] (M. Dalton Dep. at 24-25.) Draws are a pre-payment of commission. (M. Dalton Dep. at 24.) He had a right to draw up to $5,000 per month before he earned a commission. (M. Dalton Dep. at 24.) When one of his prospects joined the firm, the draws were deducted from the commission he earned. (M. Dalton

/ / /

---

[11]      Unless otherwise noted, page references to docket entries are to the page numbers assigned by the Electronic Case Filing System.

[12]      M. Dalton had a similar arrangement with Ardent and/or SAI. (Dalton at 1242-43.)

Dep. at 24.)  M. Dalton took the draw for approximately four months and had not yet paid it off at the time of his deposition.  (M. Dalton Dep. at 25.)

The Court agrees with the Special Master that "use of accomplice testimony . . . is to be carefully scrutinized."  (TR at 1549.)[13]  With this in mind, the Court reviewed the totality of the evidence presented to the Special Master to determine whether M. Dalton's testimony is corroborated.

The disputed points of M. Dalton's testimony are corroborated by conference call agendas printed on Ardent letterhead as well as by Dalton's own email messages. For example, when the Keating Group members were preparing to leave TRG, a December 17, 2014 conference call agenda includes the following items:  "Load into databases and cloud before exit;" "Minimize discoverable and subpoenas;" "lawsuit preparation," and "JK, RG and AM Questions."[14]  (TRG Reply Exh. 567.)[15]  On January 9, 2015, the day before the Keating Group members were fired from TRG for suspicious download activity, Dalton emailed Keating under subject line "Questions" a list including the following, "Details or draft on [*sic*] resignation letter;" "Do we file for a pre-emptive TRO?" "When do the staff leave?  Same time?  Before?" "FSC database is not as updated as Sales Force, can we use Sales Force;" "Sales Logix data on phone.  Should we wipe the phones?  Contacts on phone?"  (TRG Reply Exh. 68.) Two months later, the March 9, 2015 conference call agenda lists "Keating doc disposal" as one of the items to discuss.  (TRG Reply Exh. 739.)  The foregoing exhibits corroborate the crucial points in M. Dalton's testimony.  (*See also* TR at 1562-63.)

/ / /

---

[13]     References to "TR" are to the transcripts of the Special Master proceedings (*see* fn. 6 *supra*) insofar as they do not reference witness testimony but, for example the Special Master's or counsel's comments.  Page references in the text above are to the page numbers in the transcript.

[14]     JK, RG and AM are initials of the Keating Group members Jeremy Keating, Richard Gigliotti, Alexander Mele.

[15]     TRG's Reply Exhibits are found in doc. no. 456-1.

The Ardent Group next contends that the December 17, 2014 and March 9, 2015 conference call agendas were falsified. (Ardent Opp'n at 13; Silvers at 1073-74, 1098; Dalton at 1310.) This contention is rejected for three reasons. First, although the agendas were introduced at M. Dalton's deposition on June 14, 2017 (M. Dalton Dep.; Silvers at 1075), the Ardent Group waited for more than a year and a half before raising the issue for the first time in passing in February 2019 (Silvers at 1079; *see also* TR at 1369 (Special Master, Sayyar)).[16] Second, on May 14, 2019, the Ardent Group filed a motion for terminating sanctions against TRG contending that six documents, including the conference call agendas, were falsified. (Doc. no. 410.) Magistrate Judge Andrew G. Schopler entertained voluminous briefing and oral argument. He denied the motion because he found that the Ardent Group did not meet its burden of proof that the documents were falsified. (Doc. no. 441; *see also* transcript of the ruling, referenced in doc. 441.) The Ardent Group did not object to this ruling. *See* Fed. R. Civ. Proc. 72. Finally, the conference call agendas are consistent with Dalton's email discussed above.

Based on the foregoing, the Court adopts the Special Master's finding that the Ardent Group formed a deliberate plan to destroy evidence in anticipation of litigation.

### 2.  Deletion of Computer Files

The Special Master further found that the Ardent Group deleted or caused the deletion of extensive electronic evidence, including metadata. (*See* Recommendation at 9, 11, 13.) Upon review of the record, the Court adopts this finding.

The finding is supported by the testimony of TRG's computer forensic expert Allan Sevel. Sevel and the Keating Group's computer forensic expert Ashraf Massoud testified in the Special Master proceeding. Sevel forensically imaged and reviewed the electronic devices from the Keating Group and Silvers. Among other things, he looked

---

[16] When Silvers raised the issue again more specifically in the opening statements and testimony in the Special Master proceedings on April 15, 2019 (*see* TR 1078, 1083, 1369), Special Master was skeptical of his protestations of falsity. (*See, e.g.,* TR at 1083-86, *see also id.* at 1368-69.)

for information involving cloud storage and file access. Massoud reviewed Sevel's report and evaluated his images of the computer data.

On December 26, 2014, before meeting Silvers at Ardent's offices, Mele exchanged the following messages with Silvers:

> Mele:          "Gonna bring my laptop (personal) and TRG."
> Silvers:       "Yeah . . . feel free to leave the TRG one"

(TRG Reply Ex. 259; *see also* Mele Dep. at 285.)[17]  Sevel concluded that over 1,000 files were deliberately deleted from Mele's laptop *in one day* -- on January 12, 2015, the same day the Keating Group filed this action and two days before the laptop was turned over to Sevel.  (TRG Exh. 902 ("Sevel Report") at 5, Exh. 900 ("Massoud Report") at 8.)  The number of deletions on January 12, 2015, was grossly disproportional to the rate of one to three deletions per day prior to that.  (Sevel Report at 5.)  Many of the deleted files were TRG-related user files, which cannot be recovered.  (Sevel 338, 380-81; *see also id.* at 340-41, Sevel Report at 5, Massoud at 393 (files moved to trash folder).)[18]

With respect to Keating's laptop, Sevel found that many files had been deleted and could not be recovered.  (*See also* Massoud at 390, 400.)[19]  Present on the laptop was evidence of LNK files.  An LNK file is a shortcut that points to another file at a specific location.  (Sevel at 320; Massoud at 389.)  LNK files can be used to locate files on the computer or in a cloud storage account such as Google Drive.  (Sevel at 345-46.)  The significance of an LNK file is that it shows information about the

/ / /

---

[17]    Excerpts from Mele's deposition of are found in doc. no 456-1 at 204-14.  Page references in the text above are to the page numbers in the deposition transcript.

[18]    Files are not automatically transferred to the trash folder.  A user must transfer them.  (Sevel at 335.)

[19]    Massoud was tasked with recovering 27 specific files which had been deleted from Keating's laptop.  Of those, he could only recover two.  (Massoud at 390, 400.)

destination file, such as the date it was created and probably the date it was last modified.[20] (Sevel at 348.)

Specifically, Keating's laptop contained LNK files which showed that other files had been there before, but no longer existed and could not be recovered. (Sevel at 322, 348.) They also showed he had frequently accessed a Dropbox account. (Sevel at 320.) His laptop had a Dropbox file folder. (Sevel at 320.) A Dropbox file folder is created when a user synchronizes his or her computer with a Dropbox account. (Sevel at 320.) The resulting folder contains the files stored in the Dropbox account. (Sevel at 320.) Although numerous LNKs on Keating's laptop pointed to Dropbox files, his Dropbox file folder was empty. (Sevel at 320-21.) While some of the files were found in other locations on his laptop, others could not be found at all and are not recoverable. (Sevel at 321, 323.)

One of the main folders in Keating's Dropbox folder was named TRG. (Sevel at 324, 347.) It listed names of subfolders and files which were no longer present. (Sevel at 324, 347.) One of the unrecoverable files was named "C:\users\Jeremy.Keating\Dropbox\TRG\upload to Salesforce\silver to Keating transfer." (Sevel at 324.) A file with exactly the same name was found on one of Silvers' computers. (Sevel at 348-49.) The last time Keating accessed the Dropbox account was November 2014. (Sevel at 321.)

Keating's laptop also showed he accessed a Google Drive account, as evidenced by the presence of LNKs; however, the files the LNKs were pointing to could not be recovered. (Sevel at 322, 324.)

The foregoing forensic evidence corroborates M. Dalton's testimony that prior to filing this action, the Keating Group and the Ardent Group used cloud storage

/ / /

---

[20] Although an LNK file does not include the contents of the file it points to (Massoud at 389), it is significant for the information it can provide about that file, *i.e.*, metadata (*see* Sevel at 348).

accounts for their transfer of data from TRG to Ardent, and that the evidence of transfer was intentionally destroyed.

TRG further claims that destruction of evidence continued after this action was filed. On March 23, 2015, TRG and Jastremski filed a counterclaim which named a number of counter-defendants, including Silvers, Dalton and Ardent. (Doc. no. 24.) On March 26, Matt Nelson, Ardent's "IT guy" (Nelson Decl. at 2),[21] sent the following message to Silvers: "Throw that tower and laptop in your car. I have an extra hard drive you can have if I need to copy any personal files before cleaning them." (TR at 1132.) Although Silvers denies "cleaning" refers to deleting files, when the message is considered in the context of all the evidence, it strongly suggests that files were deleted from Silvers' computers in anticipation of discovery.

Silvers told M. Dalton that the computers used to store the data taken from TRG were destroyed in 2015. (M. Dalton Decl. at 12; M. Dalton Dep. at 302-03.) In the summer-fall of 2015, when this case entered the discovery stage and the Keating Group's motion for partial summary judgment was being briefed, "[e]veryone was running for cover and destroying evidence that they . . . took any TRG material." (M. Dalton Dep. at 384.) They wanted to conceal any "footsteps in the sand . . . that could link them back to being a part of taking proprietary information." (M. Dalton Dep. at

---

[21]    Nelson's declaration, filed in support of the Ardent Group's opposition, can be found in doc. no. 453-2 at 63-64. Page numbers in the text above are the page numbers in his declaration.

Nelson was TRG's "IT guy" before transferring to Ardent in April 2013. (M. Dalton Dep. at 75; Nelson Decl. at 2.) He was a "data miner" in that he did research to find client prospects first for TRG and later also for Ardent. (Nelson Decl. at 2; Silvers at 1035, 1140-41; Dalton at 1245-46.) In 2012, while Nelson was still at TRG, Dalton paid him for financial advisor data for recruitment purposes. (M. Dalton Dep. at 76, 376; Nelson Decl. at 2; Dalton at 1246-47.) Later, Dalton enticed him to steal TRG customer and contact data for [the Keating Group]." (M. Dalton Dep. at 373-74; M. Dalton Decl. at 6; *see also, e.g.,* Silvers at 1113-14 ("leads" and referencing TRG Exh. 731).) Although Dalton and Nelson deny that Nelson provided client and prospect data to Ardent while he still worked for TRG, his own email messages contradict that statement. (*Cf.* Nelson Decl. at 2 & Dalton at 1247 *with* TRG Exh. 731.)

384.)  For example, on August 16, 2015, a message between Dalton and two of his associates states:  "FYI, given discovery requests from [Jastremski], we will not be putting [illegible exhibit scan] prospects in Ardent CRM.  We do not want any emails, etc linking with Ardent at this point in time."  (TRG Reply Exh. 995.)

In the fall of 2016, Silvers wanted "to get out of this case by striking a deal with Mr. Jastremski."  (Silvers at 1046; *see also id.* at 1135.)  Just as with M. Dalton, in exchange for a release, Jastremski wanted access to all of Silvers' electronic devices and a signed declaration.  (Silvers at 1046, 1135.)  Silvers agreed to have Sevel duplicate all of his computer devices.  (Silvers at 1047.)  Although Silvers eventually did not reach a settlement with Jastremski and TRG because he did not want to sign a declaration, Sevel was able to mirror the data stored on Silvers' electronic devices.  (Silvers at 1047-48, 1135-38.)

Silvers provided Sevel his HP Envy laptop, two PNY USB flash drives, a travel laptop, and a Lexar 8 gigabyte flash drive.  On the whole, Sevel determined that a total of more than 10,000 files were deleted.  (*See* Massoud Report at 4.)  Approximately 1,712 files were deleted between December 2015 and February 2016.  (Sevel at 332.)  The great majority of those files are not recoverable.  (Sevel at 332.)  Massoud concurred insofar as he found at least 50, and possibly more than 100, "hard deletions."  (Massoud at 395-97.)  Hard deletions are intentionally made by a user and generally also conceal the fact that the deleted data was ever present on the computer.  (Massoud at 396; Sevel at 339.)

Silvers' HP laptop contained several cloud storage folders and some LNKs to Google Drive files; however, approximately 25% of those files were missing.  (Sevel at 326, 327.)

The data on Silvers' 32 gigabyte PNY flash drive was wiped and a DBAN program was installed on it on December 29, 2016, approximately six days before the drive was provided to Sevel.  (Sevel at 327-30, 349, 409-10.)  The sole purpose of a DBAN program is to wipe a computer drive.  (Sevel at 327-28, Massoud at 398.)

Silvers claims that he did not use this program.  (Silvers at 1151.)  This is contradicted by the fact that the program left traces on Silvers' flash drive showing that it had been used.  (Sevel at 329-30, 409; *see also* Massoud at 398.)  The data that was stored on this drive before is no longer recoverable.  (Sevel at 409-10, *see also* Sevel at 329-30; Massoud at 398.)

Silvers' second PNY flash drive contained a VeraCrypt encryption program, which encrypts an entire device, as opposed to just a selected document or communication.  (Sevel at 331.)  When Sevel asked Silvers about it, Silvers told him he used it on his travel laptop.  (Sevel at 331-32.)  However, Silvers had not provided that laptop to Sevel.  (Sevel at 331-32.)  Silvers produced it after Sevel mentioned this to Jastremski.  (Sevel at 332.)  Sevel used the VeraCrypt program to decrypt the laptop to be able to review it.  (Sevel at 333.)  He found that numerous files had been deleted.  (Sevel at 333.)

Finally, Sevel also concluded that approximately 172 files, including user files, were deleted from Silvers' Lexar 8 gigabyte flash drive.  (Sevel at 332.)

In addition to examining Silvers' electronic devices, Sevel accessed several cloud storage accounts to which Silvers had given him passwords.  (Sevel at 333, 354.)  He was not able to gain access to Silvers' Dropbox account, because Silvers said he no longer had access.  (Sevel at 333.)  He was not able to log on to Silvers' box.com account, because the password Silvers gave him did not work and Silvers said he no longer had access.  (Sevel at 333-34.)  Sevel also accessed the Google Drive account associated with Silvers' email, but it only had files in the "trash" folder, indicating that they had been intentionally deleted.  (Sevel at 334-35).[22]

///

---

[22]  Once data is deleted from a cloud account, the files usually become unrecoverable after 30 days.  (Sevel at 321; Massoud at 401.)

Sevel's conclusions after examining electronic devices belonging to Mele, Keating and Silvers support the Special Master's finding that the Ardent Group destroyed or caused the destruction of electronic evidence, including metadata.

### 3. Destruction of Employee's Hard Drive

Special Master found that on August 4, 2015, shortly before TRG's opposition was due to the Keating Group's summary judgment motion (*see* docs. no. 42, 50, 51), Dalton and Silvers caused the destruction of office assistant Christina Abernathy's[23] hard drive. (Recommendation at 8.) Having reviewed the record, this Court adopts the finding.

In the summer of 2015, when Silvers was Ardent's office manager (Silvers at 1033; Dalton at 1192), he supervised Nelson, Ardent's "IT guy," and Abernathy, a "caller." (Nelson Decl. at 2; Silvers at 1034; M. Dalton Dep. at 75.) Abernathy had assisted the Keating Group with their transition to Ardent. (Dalton at 1299; *see also* TRG Reply Exh. 68 (referencing "CA"); fn. 9 *supra*.) Nelson had transferred to Ardent from TRG in 2013. (Nelson Decl. at 2; *see* M. Dalton Dep. at 384; *see also* fn.21 *supra*.) As Ardent's "caller," Abernathy accessed the Zoho database to obtain prospect and client information, called them, and scheduled them for investment seminars and advisor appointments. (Silvers at 1035; Dalton at 1215; *see also* Silvers at 1036-37.) At her own request, and unlike other employees, Abernathy was permitted to use her personal laptop to access the database. (Silvers at 1036, 1045.)

Silvers claims that Abernathy was often late for work and had a bad "attitude," which led to his decision to terminate her. (Silvers at 1036; TRG Reply Exh. 758; *see also* Dalton at 1216.) Silvers and Dalton spoke about "checking" Abernathy's laptop before terminating her. (Silvers at 1041; Dalton at 1220.) Their explanation was that they wanted to be sure she did not keep confidential client information on her laptop after she was precluded from accessing the Zoho database. (Silvers at 1042; Dalton at 1219-20.) Accordingly, Silvers had Nelson "take a look" at Abernathy's laptop while

---

[23] The parties also refer to her as Tina Abernathy.

she was at lunch and "had him check, you know, basically everything." (Silvers at 1042; *see also* Dalton at 1220.) Silvers claims he did not see anything on Abernathy's laptop "that would have been of any concern to [him]" (Silvers at 1044; *see also* Dalton at 1223), and that when Nelson was done and Abernathy came back from lunch, she continued to work on her laptop (Silvers at 1043, 1119-20). It is undisputed, however, that her hard drive was destroyed and Ardent paid for its replacement.

The Ardent Group argues that the Special Master erred when he found they caused the destruction of Abernathy's hard drive. They claim they had no intention to destroy it and that it was destroyed a few days later by an unrelated power surge. In support of this argument, they point to Sevel's and Abernathy's deposition testimony, Nelson's declaration, and Dalton's testimony in the Special Master proceeding. The Court finds the Ardent Group's argument unpersuasive and concurs with the Special Master that their explanations are not credible. (*See* TR at 1005, 1555, 1565.)

Immediately before having Nelson check Abernathy's computer, Dalton and Silvers exchanged the following text messages:

> Silvers:     "I think her laptop is here"
> [¶]
> Dalton:      "Crack it.  Let's get it done"

(TRG Reply Exh. 654.) Sevel was asked whether "crack it" in this message meant "to destroy the information from the laptop." (Sevel Dep. at 63.)[24] He responded he could not tell from looking at the text message, because he did not know what was on Dalton's mind. (Sevel Dep. at 63.) Accordingly, Sevel's testimony does not support the Ardent Group's argument that the Special Master erred.

In his declaration Nelson avers that "at no time did I seek to do any damage to [Abernathy's] computer." (Nelson Decl. at 2.) This statement is carefully crafted to bear only on Nelson's state of mind, as *he* did not *seek* to do any damage, but stops

---

[24]     Excerpts from Sevel's deposition are found in doc. no. 453-2 at 17-24. Page references above are to the page numbers in the deposition transcript.

short of asserting that he in fact did not do any damage.  It also stops short of bearing on Silvers' or Dalton's state of mind.  Accordingly, Nelson's declaration is insufficient to undermine the Special Master's conclusion.

Dalton testified that by "crack it," he meant "crack it open."  (Dalton at 1221.) He and Silvers had a plan that if Abernathy's laptop had any personally identifiable information about Ardent's clients, Silvers should have that information deleted. (Dalton at 1221.)  This plan did not involve destroying the laptop.  (Dalton at 1221-22.)  After Nelson checked the laptop, Silvers called Dalton to let him know, "It's clean.  We're fine."  (Dalton at 1222.)  Dalton's testimony stops short of asserting that the hard drive was not "cleaned" in some fashion before Silvers informed him that "It's clean."  He had no way of knowing that, because "[he] wasn't there," his office was not at Ardent in San Diego but in Indiana.  (Dalton at 1334, 1192)

Moreover, Dalton's testimony is contradicted by M. Dalton, as well as email and text messages strongly suggesting that Abernathy's hard drive was not destroyed by accident, as claimed by the Ardent Group.  (*See* Silvers at 1043.)  According to Silvers, something . . . happened with a bunch of the computers, and Tina's included."  (Silvers at 1044.)  There was "a power surge or what have you . . .."  (Silvers at 1044.)

M. Dalton testified that Silvers had told him Abernathy's computer was intentionally destroyed.  (M. Dalton Dep. at 303-04.)  Silvers and Dalton gave Nelson "the go ahead" to destroy the hard drive while Abernathy was at lunch "to make it appear as if her computer just stopped working [and] she wouldn't discover that they were actually on her computer."  (M. Dalton Dep. at 303-04.)  Silvers told M. Dalton that Dalton had told him "to make sure there wasn't any info on Tina Abernathy's machine which could incriminate them if she returned to TRG."  (M. Dalton Dep. at 384.)

As discussed above, the Ardent Group argues that M. Dalton's testimony should not be believed.  However, as before, his testimony is corroborated.  For example, in an email chain between Silvers and Dalton about Abernathy's termination, Dalton

18

warned Silvers, "Tread lightly. Remember, if she decides to call John [Jastremski] and stir the pot out of revenge, we have issues." (TRG Reply Exh. 758.)

The Ardent Group relies on Silvers' deposition testimony in an attempt to minimize the significance of this message. (Silvers Dep. at 247-49.)[25] Silvers testified:

> Q    What are the issues?
> A    . . . I don't know what issues he would have been referring to . . ..
> Q    Did you ask and say, "Steve, what are you talking about? What issues could we possibly have?"
> A    . . . conversations like this, . . . I would leave be because I didn't want to get into a whole conversation back and forth about what may or may not be around, so --

(Silvers Dep. at 248.) His answers were evasive and did not address the clear implication of Dalton's message that he was concerned she would provide damaging information to Jastremski.

In another attempt to minimize the significance of Dalton's message, the Ardent Group relies on Abernathy's testimony that "tread lightly" had nothing to do with TRG or this case. (Abernathy Dep. at 93-94.)[26] Her testimony is not persuasive because the Ardent Group has not shown that Abernathy knew what was on Dalton's mind. It also does not negate the clear implication of Dalton's message that he was concerned Abernathy may leak information to Jastremski.

Dalton testified he was concerned that Abernathy would contact Jastremski and lie to him to create problems for the Ardent Group in this litigation. (Dalton at 1329-31.) His own prior testimony shows, however, that his concern was not that Abernathy may lie, but that she could disclose what she knew about the surreptitious transfer of TRG client information. He admitted that Abernathy assisted Mele in transitioning his

---

[25]    Excerpts from Silvers' deposition are found in doc. no 456-1 at 296-314. Page references above are to the page numbers in the deposition transcript.

[26]    Excerpts from Abernathy's deposition are found in doc. no. 453-2-1 at 9-15. Page references above are to the page numbers in the deposition transcript.

book of business to Ardent and potentially could have had some of Mele's TRG data. (Dalton at 1299-300.) Soon after the transition, he was already concerned with what she knew about the transition activity. For example, in his April 13, 2015 email to Davenport, one of his partners at Ardent, Dalton scolded Davenport for sending an email about the next "WealthMax" prospect solicitation campaign to a list of recipients, including Abernathy. He cautioned,

> In the future, ALWAYS blind copy everyone. There are people on that list, Tina, for example, that should not have contact info on anyone. . . . Further Jan and Jeremy [Keating] are both either IN litigation, or on the cusp of it. This email is discoverable. Please email direct instead of "company blasts."

(TRG Reply Exh. 44 (emph. in orig.); *see also* Dalton at 1248.) M. Dalton's testimony that the motive for destroying Abernathy's computer was fear that she would provide incriminating evidence to Jastremski in the middle this litigation is corroborated by credible evidence.

The Ardent Group's explanation that Abernathy's hard drive was accidentally destroyed by a power surge is also not credible. The explanation relies on the premise that Abernathy's hard drive was not destroyed on August 4, when Nelson looked at it, but a few days later. (*See* Dalton at 1222-23 (laptop reviewed on Tuesday, power surge on Thursday).) This explanation is not credible.

Nelson checked Abernathy's computer on Tuesday, August 4, 2015, when the following text messages were exchanged:

> Silvers:     "I think her laptop is here"
> [¶]
> Dalton:     "Crack it. Let's get it done"
> Silvers:     "I need Sam to go to lunch"[27]
> Dalton:     "Good call"

/ / /

---

[27]     Sam was Abernathy's roommate. (Silvers at 1120.) Silvers didn't want Sam to tell Abernathy that Silvers was looking at her computer. (Silvers at 1120.)

(TRG Reply Exh. 654; *see also* Dalton at 1220.)  On Monday, August 10, 2015, Abernathy sent a message to Mele stating,

> I haven't had access to my email in a week.  There was a power surge that fucked everyone's PC, including my laptop. . . . My laptop just needs a new hard drive so we will see if [Dalton] will pay for it.

(TRG Exh. 544;[28] *see also* Silvers at 1121.)  Approximately a week earlier was August 4, when Silvers had Nelson look at Abernathy's laptop.  (Silvers at 1121.)  Abernathy's message to Mele shows that her hard drive was destroyed approximately a week before, when Nelson looked at.  This corroborates M. Dalton's testimony that it was intentionally destroyed.

Moreover, also on August 10, 2015, after Abernathy's message to Mele, Silvers and Dalton had the following text message exchange:

| | |
|---|---|
| Dalton: | "So Tina lives to fight another day.  Tomorrow will be her last."[29] |
| Silvers: | "She is going to hit you up for a new hard drive" |
| [¶] | |
| Silvers: | "I think she took it to a store and she was due for a free upgrade to Windows 10"[30] |
| Dalton: | "OK, so why would she ask me for a new hard drive then?" |
| Silvers: | "I guess the guy told her that's what needed to be replaced" |
| Dalton: | "Hmmmm.  If that's what we have to do, let's do it.  But from my perspective, he probably diagnosed her computer based on the fact that I [*sic*] had failed, and he doesn't know the circumstances behind it. . . ." |

(TRG Reply Exh. 656.)  Dalton's comment at the end of the exchange shows he was concerned Abernathy may have learned from the computer technician at the store that

---

[28]    TRG's exhibits filed in the Special Master proceedings are found at docs. no. 404-1 through 404-6.

[29]    Silvers explained that he had to postpone terminating Abernathy because they had to fix her computer.  (Silvers at 1120.)

[30]    Silvers explained that Abernathy had taken her computer to Best Buy or Office Depot to have it looked at and called Silvers to let him know what was wrong with it.  (Silvers at 1124.)

her hard drive was not destroyed by accident.  This further corroborates M. Dalton's testimony that Abernathy's hard drive was intentionally destroyed.

Based on the foregoing, the Court adopts the Special Master's finding that Silvers and Dalton intentionally caused the destruction of Abernathy's hard drive to prevent her from providing incriminating evidence to Jastremski and TRG.

### B.    Knowledge and Intent

In order to impose terminating sanctions for spoliation of evidence, the court must find, among other things, that evidence was deliberately destroyed with at least some notice that it may be potentially relevant to litigation.  *Kitsap Physician Serv.,* 314 F.3d at 1001; *Leon*, 464 F.3d at 958-59; *Anheuser-Busch,* 69 F.3d at 348.  Based on the evidence of spoliation discussed above, the Court finds that the Ardent Group intentionally destroyed evidence in anticipation of and during litigation with knowledge that the evidence may be potentially relevant to TRG's prosecution of its counterclaims against the Ardent Group.  To the extent the Ardent Group claims the evidence they destroyed is not relevant, the argument is precluded because their actions render it impossible to determine relevance with any certainty at this time.  *See Leon*, 464 F.3d at 959.  The Court also finds that the Ardent Group's spoliation of evidence was committed in bad faith with the intent to thwart TRG's presentation of its case and thus undermine the integrity of judicial proceedings.  *See Anheuser-Busch,* 69 F.3d at 348.

### C.    Prejudice

Another factor the Court must consider before ordering terminating sanctions is the risk of prejudice to the party seeking sanctions.  *Leon,* 464 F.3d at 958; *Rio Int'l Interlink*, 284 F.3d 1022.  "The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case."  *Leon*, 464 F.3d at 959.  In this regard,

> Due process concerns . . . require that there exist a relationship between
> the sanctioned party's misconduct and the matters in controversy such that

the transgression threatens to interfere with the rightful decision of the case.

*Anheuser-Busch,* 69 F.3d at 348.

Although TRG does not, and cannot, specifically identify what information was destroyed, it is apparent that the destroyed evidence of surreptitious transfer of information from TRG to Ardent during the Keating Group's transition was relevant to TRG's counterclaim for misappropriation of trade secrets. This also establishes a sufficient relationship between the Ardent Group's destruction of evidence and matters in controversy in this action.

Furthermore, "it is appropriate to presume that where documents relevant to the merits of the litigation have been concealed, the deception casts doubt on the concealing party's case." *Anheuser-Busch,* 69 F.3d at 354; *see also id.* at 355; *Kitsap,* 314 F.3d at 1002 ("adverse inference triggered by actual spoliation"). In this regard, the Ardent Group's spoliation of evidence impaired TRG's ability to go to trial and threatened to interfere with the rightful decision of this case.

In addition to the destruction of evidence, the docket in this case shows the Ardent Group's repeated failure to comply with discovery requests and the Magistrate Judge's discovery orders, repeated failure to timely pay sanctions related to discovery misconduct, and the entry of a contempt order against Ardent related to discovery misconduct. (*See* TRG Reply Exh. 999A and docket entries referenced therein.) All of the foregoing independently prejudiced TRG's ability to go to trial by causing extensive and needless delay of the proceedings, causing TRG to incur attorneys' fees, depriving it of relevant discovery and, ultimately, of probative evidence, thus threatening to interfere with the rightful decision of this case.

The Ardent Group argues that TRG is not prejudiced because, for the most part, evidence was not destroyed but merely moved to the cloud or somewhere else in the cloud or somewhere else on the various computers. (*See* Opp'n at 2-3, 11; *see also*

Silvers at 1153.)  In essence, this argument implies that litigants can play an endless shell game.  If the evidence still exists, as the Ardent Group contends, then its members have had more than two years to produce it pursuant to TRG's various discovery requests.  However, based on the forensic experts' uncontroverted testimony, much of the electronic data has been irretrievably destroyed.  The Ardent Group's argument is rejected.

### D.    Availability of Less Drastic Sanctions

Before imposing terminating a party's claims or defenses, the Court must also consider less drastic sanctions.  *Leon*, 464 F.3d at 959; *Rio Int'l Interlink*, 284 F.3d 1022.  However, implementing less drastic sanctions or warning a party that terminating sanctions may result does not apply when a party destroys evidence before the court has an opportunity to order less drastic sanctions or issue a warning.  *Leon*, 464 F.3d at 960.  This is the case with any evidence the Ardent Group destroyed prior to filing this action.  Furthermore, the evidence discussed in this Order shows that the spoliation activity during the pendency of this action occurred before the misconduct became apparent.  Accordingly, the Court had no opportunity to issue warnings or impose less drastic sanctions for spoliation.  (*See* TRG Reply Exh. 999A (first motion to compel filed Mar. 24, 2017).)

Furthermore, since April 28, 2017, when the Magistrate Judge granted TRG's motion to compel, the Ardent Group has repeatedly flouted discovery rules and orders.  On several occasions the Magistrate Judge imposed less drastic sanctions, such as monetary sanctions and contempt to no avail.  (*See* TRG Reply Exh. 999A.)  Given the Ardent Group's deliberate pre-litigation plan to hide evidence by various means including destruction, it is unlikely that any warning or lesser sanctions imposed in this action would have been effective.  In light of the record of protracted, deliberate and egregious misconduct, the Court finds that entering default against Ardent Group members to be the only appropriate sanction.

/ / /

24

The Ardent Group argues that their discovery misconduct is attributable to their former counsel David Hall and they should not suffer the consequences. (Opp'n at 14-15; *see also* Dalton at 1270-83, 1324-29.) This argument is rejected because clients are bound by the acts of their attorney. *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 (1962). This does not impose "an unjust penalty" on the client. *Id.* at 633. The client

> voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent . . ..

*Id.* at 633-34. Moreover, the Ardent Group has presented no evidence to show that Hall instructed or encouraged them to destroy evidence or approved of it at any time.

### E.    Remaining Factors

Next, the Court considers whether the public's interest in expeditious resolution of litigation and the Court's need to manage its dockets favor imposition of terminating sanctions. *See Leon*, 464 F.3d at 959; *Rio Int'l Interlink*, 284 F.3d 1022. These factors support terminating sanctions when destruction of evidence "greatly impeded resolution of the case by obscuring the factual predicate of the case and consuming months in sanction-related litigation." *Leon*, 464 F.3d at 958 n.5.

Based on review of the record, the Court adopts the Special Master's conclusion that, due to the Ardent Group's destruction of relevant evidence and stonewalling of discovery requests, this case was bogged down in discovery for years and impossible to move forward to trial. (*See* Recommendation at 12.)

Finally, the "public policy favoring disposition of cases on their merits" generally weighs against terminating sanctions. *Leon*, 464 F.3d at 960-61. However, standing on its own, it is "not sufficient to outweigh the other four factors." *Leon*, 464 F.3d at 961. As all other factors support terminating sanctions, the court grants TRG's motions and overrules the Ardent Group's objections to the Special Master's Recommendation.

Accordingly, it is **ORDERED** as follows:

1.     The Retirement Group, LLC's motion to adopt the Special Master's Recommendation (doc. no. 442) is granted.

2.     The Retirement Group, LLC's motion for terminating sanctions (doc. no. 157) is granted as to Lloyd J. Silvers, Steven Dalton and Ardent Retirement Planning, LLC.

3.     The Clerk shall strike the answers filed by Lloyd J. Silvers, Steven Dalton and Ardent Retirement Planning, LLC (docs. no. 128, 129) and enter default as to these parties.

**IT IS SO ORDERED.**

Dated:  April 9, 2020

Hon. M. James Lorenz
United States District Judge